**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JASON JAMES NEIHEISEL,

              Petitioner,

vs.                                Case No.:    3:20-cv-313-BJD-JBT
                                                            3:17-cr-89-BJD-JBT

UNITED STATES OF AMERICA,

              Respondent.

_____/

## <u>REPORT AND RECOMMENDATION</u>

Petitioner Jason Neiheisel, through counsel, moves under 28 U.S.C. § 2255 to vacate his conviction and sentence for distributing child pornography. (Civ. Doc. 14, Amended § 2255 Motion, or "Am. § 2255 Mtn.")[1] He was convicted by jury trial in 2018 and sentenced to 84 months in prison. (Crim. Doc. 102, Judgment.) Petitioner challenges his conviction based on the alleged ineffectiveness of his trial counsel, Thomas Bell. The United States responded in opposition (Civ. Doc. 21) and Petitioner replied (Civ. Doc. 22).

The Honorable Brian J. Davis referred the matter to the undersigned for an evidentiary hearing and a report and recommendation. (Civ. Doc. 23, Order of Referral.) The undersigned conducted a multipart hearing on December 21, 2021, April 12, 2022, and April 13, 2022. (Civ. Doc. 32, Dec. 2021 Tr.; Civ. Doc. 43, Apr. 2022 Tr. Vol. I; Civ. Doc. 44, Apr. 2022 Tr. Vol. II.) The undersigned also received and considered post-hearing memoranda from the parties. (Civ. Doc. 52, Petitioner's Memorandum ["Pet. Mem."]; Civ. Doc. 56, Government's Memorandum.)

---

[1] "Civ. Doc. ___" refers to docket entries in the civil § 2255 case, No. 3:20-cv-313-BJD-JBT. "Crim. Doc. __" refers to docket entries in the criminal case, No. 3:17-cr-89-BJD-JBT.

## I.      Summary of the Issues and Recommendations

The Amended § 2255 Motion raises five claims of ineffective assistance of counsel. See Order of Referral at 1–2 (citing Am. § 2255 Mtn. at 2–4, 16–29). First, Petitioner alleges that he told Bell he was in (or traveling to) Cincinnati, Ohio, when child pornography was being offered from his internet protocol ("IP") address, and that there is evidence verifying he had a plane flight from Jacksonville, Florida to Cincinnati, Ohio on Sunday, February 7, 2016 at 8:34 p.m. Nevertheless, he claims that Bell unreasonably failed to investigate or present an alibi defense. Second, Petitioner claims that Bell unreasonably failed to present evidence or establish through cross-examination that someone else could have caused the distribution of child pornography from his IP address. Third, Petitioner asserts that Bell unreasonably failed to impeach the lead FBI agent, Nicholas Privette, with his allegedly misleading grand jury testimony, and failed to investigate or present evidence that Petitioner's employer-issued work laptop contained no child pornography. Fourth, Petitioner alleges that Bell unreasonably failed to investigate, obtain, or present evidence about the Torrential Downpour law enforcement software program and failed to investigate so-called "GUID" evidence.[2] Finally, Petitioner asserts that Bell unreasonably failed to notify his computer expert, Richard Connor, about the alibi, provide him discovery about Torrential Downpour and GUID evidence, give him access to Petitioner's "exculpatory router," request that he investigate Petitioner's work laptop, or elicit testimony that would have helped Petitioner establish his alibi and culpable-third-party defenses.

---

[2]      "GUID" stands for "Globally Unique Identifier."

The undersigned recommends that Bell exercised reasonable professional judgment in declining to pursue the alibi because it was a faulty defense; the evidence shows that the last time child pornography was shared from Petitioner's IP address was six hours before his flight to Cincinnati. Bell followed a sound trial strategy, which emphasized the government's burden of proof, focused on holes in the evidence, attacked the FBI's investigation, and, contrary to Petitioner's allegations, argued someone else could have used his Wi-Fi network to distribute child pornography. The only potential deficiency was Bell's failure to introduce evidence proving that Petitioner's employer found nothing improper on the work laptop. However, given the evidence and arguments presented at trial—including the unlikelihood that the jury thought Petitioner committed the offense using the work laptop anyway—Petitioner has not shown a reasonable probability the verdict would have been different had Bell eliminated the work laptop as a source of child pornography. Likewise, Petitioner tenders no actual exculpatory evidence as it relates to Torrential Downpour, GUID evidence, the router, or uncalled witnesses. Thus, the undersigned recommends that the Court deny the Amended § 2255 Motion.

## II.   Background

### A.  The Indictment and Trial

In May 2017, a grand jury indicted Petitioner on two counts of distributing child pornography, in violation of 18 U.S.C. § 2252(a)(2) and § 2252(b)(1). (Crim. Doc. 22, Indictment.) Count One alleged that on or around February 7, 2016, Petitioner knowingly distributed a video of child pornography titled "Bed Sex." Count Two alleged that on or around the same date, he knowingly distributed a video of child pornography titled "bathtime." Petitioner pleaded not guilty and went to trial.

3

It was uncontested at trial that the child pornography charged in the Indictment was shared over a BitTorrent file-sharing network connected to Petitioner's IP address.[3] An undercover law enforcement computer detected the files using "Torrential Downpour," an investigative software program that enabled the undercover computer to locate and download illicit files from the host computer.[4] It was also undisputed that the only device the government examined, Petitioner's personal Microsoft Tablet, contained no trace of child pornography. But the evidence showed that Petitioner had installed a BitTorrent client program—Vuze version 5.7.0.0—on his tablet, deleted it at some point, and used it to download two movies—"Elf" and "Daddy's Home"—from a BitTorrent website called The Pirate Bay. The evidence also established that the device that shared child pornography from Petitioner's IP address used Vuze version 5.7.0.0.

Two FBI agents, Jonathan MacDonald and Nicholas Privette, testified that they interviewed Petitioner on April 11 and April 25, 2017. (See Crim. Doc. 119, Trial Tr. Vol. II at 94–181 (Testimony of Agent MacDonald); Crim. Doc. 120, Trial Tr. Vol. III at 8–89 (Testimony of Agent Privette).) Because the interviews were noncustodial, neither was audio recorded per FBI policy, but they were memorialized in "FD-302" reports. Agents Privette and MacDonald testified that during the interviews, Petitioner admitted he had downloaded child pornography—including the specific videos charged in the Indictment––and stored them in a shared downloads folder connected to a peer-to-peer file-sharing network. Petitioner discussed how the BitTorrent sharing mechanism worked and told the

---

[3]     BitTorrent is a peer-to-peer file-sharing network used for distributing large files over the internet, such as videos and music. For a more thorough description, see United States v. Owens, 18 F.4th 928, 931-32 (7th Cir. 2021).

[4]     Torrential Downpour is a law enforcement software program configured to search the BitTorrent network for IP addresses offering files that are known to contain child pornography.

agents he periodically deleted his child pornography because he knew it could be shared with other people. In both interviews, he also discussed how he viewed child pornography through a website called Chat Tango. Petitioner indicated he was familiar with child pornography-related terms (like "PTHC")[5] and file-sharing programs like LimeWire and BitTorrent. Petitioner said he used only his personal tablet to download child pornography, but told the agents there "shouldn't be any child pornography on there."

At trial, Petitioner denied that he ever downloaded or distributed child pornography and denied that he admitted the same to the FBI agents. See Trial Tr. Vol. III at 190–277. Petitioner claimed he had never heard of BitTorrent before meeting the agents and that he told them he was unfamiliar with BitTorrent. Petitioner admitted that he downloaded a movie using Vuze but claimed he did not know Vuze was a BitTorrent program. He testified that at the second interview, he told the agents he had not "torrented enough"—— Petitioner's words——"to know how BitTorrent works." Id. at 230. He denied accessing child pornography through Chat Tango and insisted that Chat Tango came up only at the second interview. In addition, Petitioner testified that his apartment was next to a busy sidewalk and a commons area, and that the password to his Wi-Fi network was written on a 12" x 24" chalkboard near a floor-to-ceiling window in the guest bedroom.

The government recalled Agent Privette as a rebuttal witness. (Crim. Doc. 121, Trial Tr. Vol. IV at 15–26.) Privette explained how he and Agent MacDonald began cowriting an FD-302 report about the April 11 interview the same day it happened. In addition to reflecting Petitioner's confession, the report reflected a discussion about Chat Tango. This report was "serialized" on April 20, 2017, making it unalterable after that date.

---

[5]     "PTHC" stands for "preteen hardcore."

Thus, the government later argued, the discussion about Chat Tango in the report of the April 11 interview refuted Petitioner's testimony that Chat Tango did not come up until the April 25 meeting, given that the first report was locked in prior to the second meeting.

During closing arguments, the government urged the jury to weigh Petitioner's credibility against that of Agents MacDonald and Privette. Id. at 45–61, 94–107 (government's closing argument and rebuttal). The government argued that several facts corroborated Petitioner's confession: child pornography was shared from his IP address, his home internet network was password-protected, and Petitioner had installed the same Vuze BitTorrent program on his tablet that was used to share child pornography. In closing argument for the defense, Bell attacked the quality of the investigation and emphasized holes in the government's case, including the lack of any evidence that Petitioner's devices contained child pornography and the absence of any recording of Petitioner's confession. Id. at 61–93 (defense's closing argument). Bell suggested that someone else could have stolen Petitioner's exposed Wi-Fi password, hacked into his network, and used the network to share child pornography. The defense also reminded the jury that the government, not the defense, bore the burden of proof. On rebuttal, the government argued that Petitioner's suggestion that someone hacked into his Wi-Fi network was a "red herring." The government reminded the jurors it did not have to prove that Petitioner used a particular device to commit the offense, only that Petitioner distributed child pornography. The government suggested that Petitioner could have used some other device to download and share child pornography, and that he pulled "a fast one" on the agents by giving them his Microsoft tablet because Petitioner knew there was no evidence of child pornography on that device.

The jury deliberated for a day and a half, with the presiding judge giving an <u>Allen</u>[6] charge on the second day of deliberations. (<u>See</u> Crim. Doc. 124, Trial Tr. Vol. V at 7–8.) After the second day, the jury returned a guilty verdict as to both counts. (Crim. Doc. 71, Jury Verdict.) Petitioner moved for a judgment of acquittal and for a new trial based on the weight of the evidence (Crim. Doc. 74), which the Court denied (Crim. Doc. 83).

### B. Sentencing

According to the Presentence Investigation Report (PSR), Petitioner's guidelines sentencing range was 262 to 327 months' imprisonment. (Crim. Doc. 88, PSR ¶ 80.) Bell argued that Petitioner's conviction on Count Two was multiplicitous, objected to the guidelines calculation, and moved for a downward departure or variance. (Crim. Doc. 90, Objections to PSR.) Bell succeeded with several of these arguments. The government requested dismissal of Count Two, which the Court granted. (Crim. Doc. 114, Sentencing Tr. at 8–9.) The Court also struck or modified several guidelines enhancements, reducing the guidelines range to 108 to 135 months. The Court varied below that range and sentenced Petitioner to 84 months in prison. <u>Id.</u> at 66; Judgment at 2.

### C. Direct Appeal

Petitioner appealed his conviction, arguing that (1) "insufficient evidence supported his conviction and his uncorroborated confession could not be considered evidence of his guilt"; (2) the prosecutor made improper remarks, asked improper questions, and referenced inadmissible reports throughout the trial; (3) the district court erred by denying the motion for a new trial; (4) trial counsel gave ineffective assistance by failing to

---

6          <u>Allen v. United States</u>, 164 U.S. 492 (1896).

investigate a possible alibi defense; and (5) the cumulative error doctrine supported vacating the conviction. United States v. Neiheisel, 771 F. App'x 935, 937–38 (11th Cir. 2019). The Eleventh Circuit rejected each argument except for the ineffective assistance claim, which it did not reach. Id. at 938–43. Thus, the court affirmed Petitioner's conviction and sentence. These § 2255 proceedings followed.

### III.   The Evidentiary Hearing

The undersigned conducted hearings on the Amended § 2255 Motion in December 2021 and April 2022. As witnesses, the government called FBI Special Agent Nicholas Privette and trial counsel Thomas Bell. Petitioner called attorney David Lamos; his father, Thomas Neiheisel; his friend, Bryan Hafertepe; and his computer expert from the trial, Richard Connor. Petitioner did not testify. Petitioner submitted thirteen exhibits ("Pet. Ex.") and the government submitted four ("Gov't Ex."), each of which the undersigned has considered. (Civ. Docs. 30, 40, 41, Minute Entries & Exhibits.)

Listening closely as they testified, Privette and Bell impressed the undersigned as credible and reliable witnesses, whose testimony the undersigned generally accepts. Mr. Neiheisel and Mr. Hafertepe appeared sincere but had limited knowledge of the facts. Mr. Neiheisel also had an understandable interest in the outcome. Connor's and Lamos's testimony will be addressed in context, though Connor appeared to be forthright.

### A.  Nicholas Privette

FBI Special Agent Nicholas Privette testified as follows. Dec. 2021 Tr. at 16–139; see also Pet. Ex. 6, Privette's Declaration. He joined the FBI in 2016 and transferred to the Jacksonville field office in early 2017, where he was part of the Violent Crimes Task

Force and the Child Exploitation Task Force. Dec. 2021 Tr. at 17–18. Privette was the lead case agent assigned to this investigation. Id. at 20–21.

The focus of Privette's testimony was the Torrential Downpour aspect of the investigation. He described how the undercover law enforcement computer, operating the Torrential Downpour software, interacted with the host computer at Petitioner's IP address. See id. at 34–57. This testimony was based on Torrential Downpour summary logs and detail logs, which were also shared with Petitioner's computer expert before trial and with post-conviction counsel. See id. at 35–36, 40; Privette Decl. p. 8. Privette created a chart, admitted without objection as Government's Exhibit 1, which summarized eleven "Connections" between the undercover computer and the host computer. Privette testified that the exhibit reflects "absolutely everything that the government had in evidence" about the online investigation. Dec. 2021 Tr. at 36. For each "Connection," Government's Exhibit 1 identifies the associated infohash,[7] how many files were downloaded, and important timestamps, such as when the last file was downloaded during a given Connection.[8] Privette explained that a "Connection" could encompass several smaller connections, disconnects, and efforts to reconnect. Dec. 2021 Tr. at 79.

The specific videos charged in the Indictment were downloaded on Saturday morning, February 6, 2016, during Session 271, "Connection 6." Id. at 45, 48–49. But the Connection significant to the alleged alibi is the final one, "Connection 9." The log for Connection 9 began on Sunday morning, February 7, 2016 at 11:32:57 and ended Monday morning, February 8, 2016 at 11:46:22. Id. at 46–48. The infohash involved,

---

[7]     An infohash is a string of letters and numbers that uniquely identifies a torrent, which is like a set of instructions for assembling the contents of the file. See Owens, 18 F.4th at 932 n.1.

[8]     All times are local/ Eastern Standard Time, Privette's Decl. p. 9, which was not disputed.

2e71**, contained "child pornography content." Id. at 32. Although the log continued until the morning of February 8, Privette explained that the last time the undercover computer downloaded a file from Petitioner's IP address was on Sunday afternoon, February 7 at 14:35:32 (2:35 p.m.) and the last connection between the undercover computer and the computer at Petitioner's IP address ended at 14:38:52 (2:38 p.m.). Dec. 2021 Tr. at 46–48; accord Gov't Ex. 1; Privette Decl. pp. 9–11. After 2:38 p.m., the undercover computer kept trying to reconnect to the host computer until Torrential Downpour reached its program limit the next morning, since the program typically runs for a 24-hour period (give or take). Dec. 2021 Tr. at 43–44, 47–48, 128–29. The Torrential Downpour evidence fits with Petitioner offering child pornography and making his flight to Cincinnati, Privette said, because the last connection ended on February 7 at 2:38 p.m. and the flight was not until 8:34 p.m. See id. at 54.

Privette touched on "GUID" evidence, which refers to a number that can identify a file in a Microsoft Windows program. Id. at 27. In any Microsoft platform, Privette indicated, GUID data is so voluminous as to be essentially useless unless one "narrow[ed] down what is it specifically that you're looking for." Id. at 28. Also, according to an analyst Privette consulted, GUID does not apply to BitTorrent programs, which use "peer ID's" instead. Id. at 56, 57. Peer ID's are randomized numbers that identify an installation of a BitTorrent program, but because peer ID's are transitory they are not a reliable way to identify a particular device. Id. at 57–59, 130.

About Petitioner's work laptop (issued by Petitioner's employer, General Electric ["GE"]), Privette testified that the FBI did not collect any evidence from that device because the FBI had no "logical reason" to suspect it was involved in distributing child

pornography. Id. at 29–30. According to a GE representative, the company found no improper internet activity on that computer. Id. at 100.

Privette also addressed his grand jury testimony. Id. at 64–68, 101–04; see also Pet. Ex. 7 (Grand Jury Transcript) at 22–24. Privette testified that he did not mean to "represent to the grand jury that we had forensically found any evidence of child pornography" on Petitioner's tablet. Dec. 2021 Tr. at 67–68. He explained that his prior testimony, which could have created that impression, arose from an awkward "double question." Just a few questions earlier, he accurately told the grand jury that a forensic exam revealed no child pornography on the device. Id. at 67, 68; Grand Jury Tr. at 23.

On cross-examination, Petitioner challenged Privette's account of the Torrential Downpour activity with an "ICACCOPS"[9] internet log (Petitioner's Exhibit 11) and some other FBI reports (Petitioner's Exhibit 8). Id. at 76–82, 121–29. Neither these points nor any others raised on cross-examination substantially affected Privette's credibility.

### B. Thomas Bell

Thomas Bell, Petitioner's trial counsel, testified as follows. Apr. 2022 Tr. Vol. I at 8–145. He has practiced law for over 30 years, id. at 8, focusing exclusively on criminal defense for the past 10 to 15 years, id. at 9. He figured he has handled over 1,000 criminal cases during his career, including hundreds of federal cases, with a "focus on more serious charges." Id. at 10, 12. Bell estimated he has handled between 65 and 70 jury trials, including 10 to 15 jury trials in federal court. Id. at 11.

---

[9]    ICACCOPS stands for Internet Crimes Against Children Child Online Protection System. See Office of Juvenile Justice and Delinquency Prevention, https://ojjdp.ojp.gov/funding/awards/2018-mc-fx-k063.

Petitioner's parents hired Bell shortly after Petitioner was arrested. Id. at 13. The Court released Petitioner on bond provided that he live with his parents in Cincinnati. Id. Thus, much of Bell's communication with Petitioner was by telephone, although he met with Petitioner once or twice before Petitioner returned home with his parents. Id. at 13, 14. Bell described his relationship with Petitioner as "pretty good." Id. at 14.

Early on, Bell generally discussed Petitioner's options and sentencing exposure with him, but they did not "get too far down the road" because Petitioner's position was that he was "absolutely innocent." Id. Bell reviewed the initial discovery and thought it notable that there were no artifacts of child pornography on Petitioner's tablet. Id. at 16. As Bell considered different defenses, he believed that the greatest obstacle would be the FBI agents' testimony that Petitioner had confessed to the offense. Id. at 17. So, his discussions with Petitioner focused on how to address the agents' testimony. Id. Bell talked to Petitioner about contacting his fiancée, Dana Hall (who was in the apartment during the first interview with the agents), but Petitioner made it "pretty clear" he did not want counsel to contact her "in any capacity." Id. Petitioner did not explain why. Id. at 18. Petitioner did not indicate in any way that Hall might have exculpatory evidence and Bell deferred to Petitioner's judgment. Id. at 66–72.

Bell recalled that, during one of their first two meetings, Petitioner mentioned he had flown to Cincinnati on Sunday, February 7, 2016. Id. at 36–37. Bell understood that to be "a suggestion of a potential alibi defense." Id. at 37. Bell testified that he is "not a fan of alibi defenses" because, in his experience, they "are almost always never borne out by the facts and circumstances of the case." Id. While Bell has had some success with alibis, he has investigated many others that turned out to be baseless. Id. at 38.

In this case, Bell explained that he did not pursue an alibi defense because Petitioner's alleged alibi did not align with the timing of the charged conduct. Id. at 38–40. As Bell put it: "[T]he last download made by the law enforcement computer was [before 3:00] in the afternoon [of February 7, 2016], which would have meant that leaving town in the evening would not have really helped us a whole lot in my view." Id. at 38–39; see also id. at 63–65, 94. Bell also knew that the specific videos charged in the Indictment were downloaded by the undercover computer almost a day and a half before Petitioner left for Cincinnati. Id. at 40. Thus, according to Bell, the alibi "didn't strike [him] as something that we were going to get very far with." Id. Despite his skepticism, Bell suggested that Petitioner gather any information relevant to the alibi, such as airline reservations or credit card records, because he did not want to discourage or preclude any defenses. Id. at 40–41, 44. But Petitioner did not follow through with giving Bell documentation, and Bell did not press for it because he did not think the alibi would work. See id. at 42, 44. Bell also testified that he discussed the alibi with his computer expert and asked him to "check the IP addresses" on Petitioner's tablet, and the analyst confirmed that the tablet had been outside of Jacksonville. Id. at 42–43, 96–98, 132.

At some point, Bell suggested that Petitioner take a polygraph. Id. at 18. Although Bell said he is not a "big advocate of it," he explained that he hoped to use the results to convince the government of Petitioner's innocence. Id. Thus, Bell arranged for Petitioner to take a polygraph with Ron Grenier, a polygraph examiner whom Bell has used over the years. Id. at 21; see also Gov't Ex. 3 (Letter confirming scheduling of polygraph). Petitioner returned to Jacksonville for the polygraph in July 2017. Apr. 2022 Tr. Vol. I at 23. Bell testified that he remained in an adjacent room while the polygraph occurred. Id.

Afterward, Bell met separately with Grenier, who revealed that Petitioner had failed the polygraph, specifically on the subject of "receiving child pornography on a peer-to-peer system." Id. at 25–26, 28. Although Bell was not in the room for the polygraph, "there was no doubt in [his] professional mind what [Grenier had] asked [Petitioner] and what the results were." Id. at 77. Bell met privately with Petitioner, who "didn't contest that he had failed the polygraph." Id. at 29; see also id. at 75 (testifying that Petitioner said something incriminating). The results caused Bell to worry that Petitioner had shown deception about sharing child pornography. Id. at 28. Thus, the polygraph results affected Bell's strategy "at least in the short run." Id. at 30. Before Petitioner returned to Cincinnati, Bell assured Petitioner he would "do the best we can for you" and suggested pursuing a plea deal to a simple possession charge. Id. at 31. Bell recalled that Petitioner "was pretty emotionally distraught that day" and they left their strategy unresolved. Id.

In the meantime, Bell hired Richard Connor, a computer forensics expert whom Bell has relied on before, to review the evidence and to examine Petitioner's tablet. Id. at 31–32. Bell testified that he "tried to get [Connor] all the discovery that [he thought was] relevant" and is "virtually certain" he gave Connor copies of the Torrential Downpour logs. Id. at 132. Connor found no evidence of child pornography on Petitioner's tablet. Id. at 32. Bell and Connor also discussed BitTorrent in "general terms," id. at 50, including "what was happening with BitTorrent data," id. at 62. That said, Connor did not advise Bell of any flaws with the Torrential Downpour program or recommend obtaining its software information. Id. at 51–52. Bell acknowledged he was not familiar with GUID evidence, id. at 133, but, he explained, "[t]hat's why you hire an expert," id. at 134. Bell did not recall discussing GUID evidence with Connor, but he testified that he would have asked Connor

14

about developments in computer forensics. Id. Bell and Connor also discussed Petitioner's wireless router, but the discussion did not cover much beyond the fact that the FBI agents would have determined the router was secured by a password. Id. at 43–44, 50. Bell did not seek to examine the router because (1) he does not look for evidence that could be incriminating (something he was concerned about after the polygraph) and (2) Connor had not suggested the router would be useful. Id. at 49–51, 98–100.

As time wore on, the case "got back on the trial track" because Petitioner was "resistant" to pleading guilty and the government was unwilling to let him plead guilty to a possession charge. Id. at 32. With the trial drawing nearer, Bell contacted Petitioner to discuss his concerns about the polygraph. Id. at 45. Petitioner explained his poor performance, insisted "the polygraph was in error," and assured Bell he was "absolutely innocent." Id. With those assurances, Bell and Petitioner decided that Petitioner should testify because the "only meaningful chance he had of being acquitted was to testify and convince the jury; one, to explain the statements that he made to the FBI agents, and two, to generally kind of advocate for his position." Id. at 46. Bell also sent an investigator to get a map of Petitioner's apartment complex and to see if Petitioner's Wi-Fi password could have been exposed to the public through a window. Id. at 46–47.

Bell knew that Petitioner had a GE-issued work laptop and that there was no evidence it contained contraband. Id. at 47–48. Bell never planned to investigate the laptop on his own because he intended to rely on information from GE and the FBI that there was no child pornography on that device. See id. at 49. Bell testified that he intended to cross-examine Agent Privette about the lack of contraband on the work laptop and that

he intended to bring up the matter during closing argument. Id. at 48–49. However, Bell said he forgot to do so because he got sidetracked. Id. at 48–49, 106.

Petitioner cross-examined Bell about not impeaching Privette with his grand jury testimony. Id. at 81–89. Bell explained that when he read the grand jury transcripts "in the run-up to trial," he did not interpret Privette's testimony to be misleading, id. at 82–83, and he thought it was so "easily and readily explainable" that it was of "no evidentiary value," id. at 85, 89. Bell also testified that he refrained from directly accusing the FBI agents of lying about Petitioner's confession, explaining that it is better to let the jurors draw that inference for themselves. Id. at 103–04.

On cross-examination, Petitioner suggested that Bell was distracted by staffing issues and burn-out, and that he had an interest in avoiding the consequences of being found ineffective. See id. at 137–42. Neither these points nor any others brought out on cross-examination substantially affected Bell's credibility. If anything, it was apparent that despite the filing of the § 2255 motion, Bell was reluctant to say anything that might adversely affect his former client. See id. at 29, 30, 142–43.

### C. David Lamos

David Lamos testified as follows. Apr. 2022 Tr. Vol. I at 146–91. He is an attorney whose practice focuses on criminal defense in state court. Id. at 147–48, 185. Lamos is a friend of one of Petitioner's current attorneys, Mr. Kibbey, id. at 163–64, and was paid $5,000 for his testimony, id. at 173. He has offered affidavits or opinion testimony about attorney performance in several cases. See id. at 165–69.

Lamos opined that Bell performed deficiently in his pretrial investigation and at trial. Id. at 151–62. He described Bell's decisions not to investigate Petitioner's fiancée as a

16

suspect and not to pursue the alibi as "catastrophic failure[s]." Id. at 152–54. He opined that Bell was deficient, for example, for not investigating Petitioner's work computer, Torrential Downpour, and whether others had access to the Wi-Fi router. Id. at 156–57. And he criticized Bell for not cross-examining the FBI agents more aggressively about Petitioner's unrecorded confession, though he conceded that a defense attorney must be tactful if he is to suggest that law enforcement witnesses are being untruthful. Id. at 161–62. Lamos based his opinion on the Amended § 2255 Motion, Petitioner's brief on direct appeal, the Eleventh Circuit's opinion on direct appeal, American Bar Association (ABA) standards, and the trial transcripts, id. at 152, but he did not review the trial transcripts "like it was [his] job," id. at 174. Lamos also said that Bell's testimony at the hearing, which he was allowed to observe, was the "primary data" informing his opinion, id. at 176, but Lamos missed several minutes of it, id. at 180–81. Lamos did not review the government's response to the Amended § 2255 Motion or the reply, and he reviewed the exhibits in cursory fashion if at all. Id. at 174–76.

Lamos's testimony was not helpful. The Eleventh Circuit teaches that "[p]ermitting 'expert' testimony to establish ineffective assistance is inconsistent with our recognition that the issue involved is a mixed question of law and fact that the court decides." Freund v. Butterworth, 165 F.3d 839, 863 n.34 (11th Cir. 1999) (citation omitted). Thus, "expert testimony regarding performance deficiencies carries little, if any, weight." Harvey v. Warden, Union Corr. Inst., 629 F.3d 1228, 1242 n.19 (11th Cir. 2011).

Further, Lamos did not present as a credible witness. He appeared to be a paid advocate rather than a neutral expert. His opinion was based on a skewed and incomplete review of the record. And his opinion was based on incorrect statements of the law. He

stated that Bell performed ineffectively by not exhaustively investigating every potential lead and possible defense. He put it this way: "[U]nless you go down all those roads and trace those leads, then you cannot have an informed election that is a strategic decision." Apr. 2022 Tr. Vol. I at 153. But the Eleventh Circuit long ago "rejected the position that strategic decisions can be considered reasonable only if they are preceded by a thorough investigation…. [T]he correct approach toward investigation reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999) (internal quotation marks and citation omitted).

Lamos testified that a lawyer must investigate a lead "even if it's unlikely to bear fruit" because "you won't know if it will bear fruit unless you go down that road." Apr. 2022 Tr. Vol. I at 178 (emphasis added). That is incorrect. "Effective counsel is not required to pursue every path until it bears fruit or until all hope withers." Presnell v. Warden, 975 F.3d 1199, 1228 (11th Cir. 2020) (internal quotation marks and citation omitted). Instead, "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." Rompilla v. Beard, 545 U.S. 374, 383 (2005). And Lamos faulted Bell for heeding Petitioner's insistence not to contact his fiancée, Apr. 2022 Tr. Vol. I at 152–53, even though Petitioner had given Bell no reason to believe his fiancée had exculpatory information, id. at 72. According to the Supreme Court, when "a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Strickland v. Washington, 466 U.S. 668, 691 (1984). Nor do the ABA standards provide, as Lamos suggested, that an attorney must disregard

a client's directive not to contact a <u>specific</u> witness even when the client has not suggested that the witness would be helpful. <u>See</u> ABA Standards for Crim. Justice 4-4.1(b) (4th ed. 2017) ("The Defense Function") (stating simply: "The duty to investigate is not terminated by factors such as the apparent force of the prosecution's evidence, a client's alleged admissions to others of facts suggesting guilt, a client's expressed desire to plead guilty or that there should be no investigation, or statements to defense counsel supporting guilt.").[10] Lamos's opinion deserves little to no weight.

### D.  Thomas Neiheisel

Petitioner's father, Thomas Neiheisel, testified as follows. Apr. 2022 Tr. Vol. I at 192–208. He hired Bell on the recommendation of an Assistant Federal Public Defender who said, "[I]f it was my son, I would use Tom Bell." <u>Id.</u> at 194. Bell shared little information with Mr. Neiheisel because of the attorney-client privilege, <u>id.</u> at 192–93, which somewhat limits Mr. Neiheisel's knowledge of the critical facts.

Mr. Neiheisel did recall overhearing a phone conversation between his son and Bell, in which his son asked, "Should I look into credit card receipts, something that shows where I was on any given dates and times during that time frame?" <u>Id.</u> at 196. Mr. Neiheisel could not hear Bell's response, but after the call, Petitioner told him that Bell had said "no." <u>Id.</u> Mr. Neiheisel testified that while the jury was deliberating, he asked Bell, "Shouldn't we have looked into where Jason was at that point in time?," and Bell responded "That would have been nice." <u>Id.</u> at 198. Mr. Neiheisel said he was "taken

---

[10]      Further, while the ABA standards "are guides to determining what is reasonable, … they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." <u>Strickland</u>, 466 U.S. at 688–89.

aback" because Bell "acted like he hadn't even thought about it before," id. at 198–99, but Bell and Petitioner did discuss the alibi over the phone, id. at 196. Mr. Neiheisel described how between the trial and sentencing, he gathered records (at the prompting of Mr. Wandner, one of Petitioner's current attorneys) verifying that Petitioner had flown to Cincinnati on the evening of February 7, 2016. Id. at 196–97, 203–05. As for the polygraph, Mr. Neiheisel testified that Bell said he could not share the results due to the attorney-client privilege. Id. at 200–01. Bell later remarked that the results were "inconclusive" during another conversation. Id.

Although Mr. Neiheisel appeared sincere and sympathetic, his testimony carries little weight because of his lack of knowledge and understanding about the case and the obligations of defense counsel, and his understandable bias in favor of his son.

### E.  Bryan Hafertepe

Petitioner's friend, Bryan Hafertepe, testified as follows. Apr. 2022 Tr. Vol. I at 209–16; see also Pet. Ex. 13, Affidavit of Bryan Hafertepe. Hafertepe has known Petitioner since they were roommates at the University of Cincinnati (from 2008 to 2013), where they were in the same fraternity. Apr. 2022 Tr. Vol. I at 210. He testified that his affidavit was true and correct, id., and that Bell never contacted him as a potential witness, id. at 212. In his affidavit, Hafertepe said he had stayed with Petitioner and his fiancée at their apartment before the arrest, and that other than Petitioner's personal tablet, he "did not observe any other computer devices at his apartment." Pet. Ex. 13 ¶ 4. He also said it was "customary for [Petitioner and his fiancée] to openly publish their WIFI password on a bulletin board for any guest to use and that information would have been visible to the

outside through a large bay window in their apartment." Id. ¶ 5. Hafertepe said that the bulletin board was in the kitchen. Apr. 2022 Tr. Vol. I at 215.

Hafertepe acknowledged that he did not ask whether Petitioner owned any other devices, nor did he search Petitioner's belongings to find other computers. Id. at 214. Hafertepe also acknowledged that he never went outside Petitioner's apartment to see if the Wi-Fi password was visible through the window. Id. at 215. Mr. Hafertepe's testimony was of limited value regarding the pertinent issues.

### F.  Richard Connor

Richard Connor testified as follows. Apr. 2022 Tr. Vol. I at 220–46; Apr. 2022 Tr. Vol. II at 4–20. As an expert in computer forensics, Bell hired him to review the government's discovery and to examine a forensic image of the hard drive on Petitioner's tablet. Apr. 2022 Tr. Vol. I at 221–22. He distinctly remembered that the computer was "basically clean." Id. at 222. He recalled that the tablet's peer-to-peer software had not been used since December 2015, which conflicted with aspects of Petitioner's confession. Id. at 222–23. He opined "that if anything had been done, it was not done on that tablet or computer." Id. at 223.

Connor did not recall Bell discussing an alibi defense with him. Id. at 223–24. Although he was given internet activity logs for February 7 and 8, 2016, Connor said he was not told that Petitioner was out of town on those dates. Id. at 224. Still, he knew from his forensic examination that Petitioner's tablet had connected to a hotel Wi-Fi network in Cincinnati on the evening of February 7, 2016 and on February 8, 2016, but he says that he and Bell did not discuss that. Id. at 225.

Connor recalled that Bell provided him an ICACCOPS internet log (Petitioner's Exhibit 11) before trial, but that this was the "first and only case" where he had seen such a log. Id. at 227. He testified that the ICACCOPS log showed "some activity" involving Petitioner's IP address, id. at 229, but he acknowledged he did not know precisely what that activity was, id. at 228, 233. Connor testified that, whatever activity the ICACCOPS log showed, it likely reflected the activities of the undercover computer, not the "target" computer. Apr. 2022 Tr. Vol. II at 7. Connor could not say whether the ICACCOPS log showed actual connections to the host computer or only attempts to connect. Id. at 232–33, 243. Connor testified that when he "first saw" the ICACCOPS log, he thought it showed an actual connection because the type of log he normally reviews ends once the connection ends. Id. at 232–33. But in this case, he acknowledged that a Torrential Downpour log recorded attempts by the undercover computer to reconnect to the host computer beyond the last connection. Apr. 2022 Tr. Vol. II at 8–13.

About Petitioner's wireless router, Connor did not recall Bell discussing the router with him. Apr. 2022 Tr. Vol. I at 234. He testified that a router could "[p]ossibly" identify the source of child pornography. Id. At a minimum, he said, a router could show how many devices were connected to the Wi-Fi network. Id. Even so, Connor testified that routers have limited memory, which can be wiped out by a reboot or a power outage. Id. at 244–45. He did not know if, by the time the FBI interviewed Petitioner, the router would have retained memory from 14 months earlier. See id. at 245–46.

Connor did not testify about any errors or malfunctions with the Torrential Downpour program, either in this case or any other. He did not describe any exculpatory

GUID evidence. Nor did he testify that Petitioner's wireless router actually contained any exculpatory leads.

## IV.     Governing Law

A federal prisoner's claim that his conviction or sentence resulted from the ineffective assistance of counsel, in violation of the Sixth Amendment, is properly brought under 28 U.S.C. § 2255. Massaro v. United States, 538 U.S. 500, 504 (2003). To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694. "The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a Strickland claim, and both prongs must be proved to prevail." Johnson v. Alabama, 256 F.3d 1156, 1176 (11th Cir. 2001). Because a petitioner must satisfy both prongs, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "The Strickland test is not easily met." Johnson, 256 F.3d at 1176. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." Id. (citation and internal quotation marks omitted).

About the performance prong, "[j]udicial scrutiny of counsel's performance must be highly deferential," "indulg[ing] a strong presumption" that counsel's performance was reasonable and that counsel "made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 689–90. "The standard for effective

assistance of counsel is reasonableness, not perfection." Brewster v. Hetzel, 913 F.3d 1042, 1056 (11th Cir. 2019) (citing Strickland, 466 U.S. at 687). "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (emphasis added). Courts must avoid the temptation to "judge trial counsel's performance through hindsight." Id. at 1316–17 (citation omitted).

"No absolute rules dictate what is reasonable performance for lawyers." Id. at 1317 (citing Strickland, 466 U.S. at 689). "Thus, no absolute duty exists to investigate particular facts or a certain line of defense," id., only "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," Strickland, 466 U.S. at 691 (emphasis added). "And counsel need not always investigate before pursuing or not pursuing a line of defense. Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." Chandler, 218 F.3d at 1318.

When, as here, "courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Id. at 1316. That is not to say that experienced counsel can never be found ineffective, only that "[e]xperience is due some respect." Id. at 1316 n.18.

About prejudice, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

## V.   Proposed Findings of Fact and Conclusions of Law

### A.  First Ground: Failure to pursue an alibi defense

Petitioner's leading argument is that Bell was ineffective because he failed to investigate and present an alibi defense. Am. § 2255 Mtn. at 2, 3, 12–13, 19–21. Petitioner submits evidence that he had a plane flight from Jacksonville, Florida to Cincinnati, Ohio on Sunday, February 7, 2016 at 8:34 p.m. (which happened to be Super Bowl Sunday). See Pet. Ex. 1. That much is not disputed. Petitioner interprets an internet activity log as showing child pornography being offered from his IP address between the evening of February 7 and the morning of February 8, 2016. Since Petitioner took his Microsoft tablet with him to Cincinnati and he claims he owned no other personal computers, he argues he could not have been responsible for whatever activity was occurring during that time. Thus, Petitioner argues, the alibi and internet activity log show that someone else must have used his IP address to share child pornography. Had Bell investigated and presented this alibi, Petitioner claims there is a reasonable probability the jury would have acquitted him.

Bell's decision not to pursue the alibi was deliberate and strategic. According to Bell's testimony, which the undersigned credits, Petitioner mentioned during an initial meeting that he had flown to Cincinnati on February 7, 2016, which Bell understood as suggesting an alibi defense. Apr. 2022 Tr. Vol. I at 36–37. Bell testified that he is "not a fan of alibi defenses" because they are rarely borne out by the facts. Id. at 37. And in this case, Bell explained he did not pursue an alibi defense because Petitioner's plane flight on the evening of February 7 did not align with the evidence of the last time the undercover computer downloaded child pornography from Petitioner's IP address. Id. at

38–40, 63–65, 94. Having reviewed the discovery, id. at 16, Bell explained that "very early on in this case, … it was my understanding that … the last download made by the law enforcement computer was [before 3:00] in the afternoon, which would have meant that leaving town in the evening would not have really helped us a whole lot," id. at 38; see also id. at 39–40. Thus, Bell explained, the alibi "didn't strike [him] as something that we were going to get very far with." Id. at 40.

The undersigned recommends that Bell's decision not to pursue the alibi was reasonable. Bell's understanding that the evidence did not support an alibi is borne out by Agent Privette's testimony detailing the Torrential Downpour evidence. See Dec. 2021 Tr. at 34–57; Privette Decl. (Pet. Ex. 6) pp. 9–11; Gov't Ex. 1. As a result, Bell did not perform deficiently by choosing not to pursue a faulty alibi. See Strickland, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

Also, there is not a reasonable probability the outcome would have changed had Bell presented the alibi defense. To show prejudice, Petitioner must establish "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. Had Bell presented the alibi, the government would have rebutted it by showing that the last time the undercover computer had a connection with a computer at Petitioner's IP address was six hours before his flight to Cincinnati. As Agent Privette summed up the evidence:

> In summary, the last time that the law enforcement undercover computer had a connection to a host computer at IP address 76.106.190.147 [Petitioner's IP address] was on Sunday, February 7, 2016 at 14:38:52 [2:38 p.m.]. Afterward, the law enforcement undercover computer continued

> attempting to reconnect to a host computer at the same IP address but was not successful. Since the [Torrential Downpour] program typically runs for a 24-hour period, it continued to attempt reconnection until the program limit was reached the following day. No files were downloaded by the law enforcement undercover computer from a host computer at IP address 76.106.190.147 on the evening of February 7, 2016 or on February 8, 2016. Specifically, no files were downloaded from a host computer after 14:35:32 [2:35 p.m.] on February 7, 2016.

Privette Decl. p. 10; accord Gov't Ex. 1; Dec. 2021 Tr. at 46–48. And the specific videos charged in the Indictment were downloaded a full day and a half before Petitioner flew to Cincinnati. Id. at 45, 49. As Privette opined, the evidence fits with Petitioner offering child pornography and making his 8:34 p.m. flight, given that the flight was not until six hours after the last connection ended. See id. at 54. Because there is no overlap between the child pornography-related activity at Petitioner's IP address and his plane flight, there is not a reasonable probability the alibi would have caused the jury to acquit Petitioner.

Moreover, the alibi could have backfired. The alibi would have drawn attention to the fact that the host computer at Petitioner's IP address stopped sharing child pornography only hours before he left for Cincinnati. That Petitioner's departure coincided with the last time child pornography was offered from his IP address could have been viewed as more incriminating than exculpatory. Far from helping Petitioner, such evidence might have reinforced the conclusion that he—not some other person—was the one responsible for sharing child pornography.

Petitioner failed to rebut the government's (and Bell's) account of the computer activity. Using an ICACCOPS internet log (Petitioner's Exhibit 11), Petitioner tried to suggest that someone else's computer was using his IP address to communicate with the undercover computer while he was in Cincinnati. See Dec. 2021 Tr. at 121–29. But the ICACCOPS log does not show that. It shows only an infohash (2e71**, the same one

involved in Connection 9), the timestamps of undescribed events on February 7 and 8, 2016, and an IP address. Unlike the Torrential Downpour logs, the ICACCOPS log provides no information about connections, handshakes, or downloads. Based on what he learned from the Torrential Downpour evidence, Privette surmised that the ICACCOPS log shows only the undercover computer's failed efforts to reconnect to the host computer on February 7–8, 2016. Id. at 122–24.

Even Richard Connor acknowledged he did not know what the ICACCOPS log shows. Apr. 2022 Tr. Vol. I at 228, 232–33, 243. And whatever activity it does show, Connor said it likely shows the undercover computer's activities, not the host computer's, Apr. 2022 Tr. Vol. II at 7. When shown one of the Torrential Downpour logs (Government's Exhibit 4), Connor also recognized that it showed attempts by the undercover computer to reconnect to the host computer after a connection ended, id. at 8–13, consistent with Privette's description of how Torrential Downpour typically operates. Thus, the ICACCOPS log does not conflict with Privette's testimony, let alone refute it. Because Privette's testimony was informed by the Torrential Downpour records—the best evidence of the exchanges between the undercover computer and the host computer—the undersigned credits Privette's testimony over Petitioner's unsubstantiated interpretation of the ICACCOPS log.

Petitioner also raised other FBI reports to suggest that someone else must have used his IP address to communicate with the undercover computer, since some of these reports used the word "connection" to refer to the undercover computer's activities between December 6, 2015 and February 8, 2016. See Dec. 2021 Tr. at 77–82; Apr. 2022 Tr. Vol. I at 113–20; Pet. Exs. 8, 9, 10. Privette and Bell responded that the reports

28

reflected only that the Torrential Downpour investigation was ongoing between December 6, 2015, and February 8, 2016, nothing more. See Dec. 2021 Tr. at 80–82; Apr. 2022 Tr. Vol. I at 115–17.[11] Privette also explained that the reports used the word "connection" in the same sense he described on direct examination: as an "interchange" that might span "multiple connections, disconnections, reconnections, disconnections, and in some cases attempted but unsuccessful connections." Dec. 2021 Tr. at 79. After review of Petitioner's Exhibits 8, 9, and 10, the undersigned credits Privette's and Bell's descriptions of the pertinent computer activity.

To escape the gaps in his evidence, Petitioner tries to flip the burden of proof onto the government. He argues that Privette was no expert in ICACCOPS logs and

> the Government cannot refute the assertions made by [Petitioner] that the logs prove another culprit was causing [child pornography] activity rather than the Defendant who could not have been. The Government had ample opportunity to bring forth an expert on iccacops [sic] that could have testified what the logs mean, and it did not.

Pet. Mem. at 6. This argument ignores that the burden of proof and persuasion in a § 2255 proceeding rests on the movant, not the government. Beeman v. United States, 871 F.3d 1215, 1222–23 (11th Cir. 2017). Petitioner, not the government, has the burden of proving the meaning of the ICACCOPS log and he failed to do so.

A nuanced version of Petitioner's argument might be this: even if the ICACCOPS log is unclear about what it shows, had Bell prepared Connor to testify about the ICACCOPS log with an alibi in mind, the defense might have been able to sow enough confusion about the ICACCOPS log to create reasonable doubt in the jury's mind about whether a host computer was communicating with the undercover computer while

---

[11]     Petitioner's characterization of Bell's testimony about the FBI reports is incorrect. Pet. Mem. at 18–19. Nor did Bell admit prejudice, as Petitioner argues. See Apr. 2022 Tr. Vol. I at 140.

Petitioner was in Cincinnati. Even if that were so, it would ignore that Bell still had a reasonable basis for not pursuing the alibi defense based on his reasonable understanding of the Torrential Downpour evidence. And had Petitioner gone down this path, it is likely that the government would have cleared up any confusion by showing through Privette's testimony, the Torrential Downpour logs, cross-examination of Connor, or some combination thereof, that the last connection or transfer of child pornography from the host computer to the undercover computer ended six hours before the plane flight.

Petitioner also argues that by not presenting the alibi, Bell failed to present a "cohesive defense [t]heory." Pet. Mem. at 2; see also Am. § 2255 Mtn. at 16. This argument fails as well. First, a lawyer need not have a cohesive defense theory at all, as long as counsel's challenged action might be considered reasonable trial strategy. White v. Singletary, 972 F.2d 1218, 1223 (11th Cir. 1992) (concluding that the "rambling, 'confused' approach … employed by defense counsel," which was used to confuse the witnesses, make the state's evidence seem disjointed, and raise doubt in the jurors' minds, was a reasonable tactic). Second, presenting an alibi that falls apart does not create a "cohesive defense [t]heory." And third, Bell did present a cogent defense. Bell attacked the investigation, emphasized holes in the evidence, suggested that someone else could have hacked into Petitioner's Wi-Fi network to share child pornography, and reminded the jury that the burden rested on the government to prove Petitioner's guilt

beyond a reasonable doubt. See Trial Tr. Vol. IV at 61–93.[12] Petitioner fails to show that this was an unreasonable strategy.[13]

For all the reasons above, the undersigned recommends that Bell did not perform deficiently by not pursuing Petitioner's alleged alibi, nor was Petitioner prejudiced

### B.  Second Ground: Investigating Witnesses and Third Persons

Petitioner claims Bell gave ineffective assistance by failing to present evidence or establish through cross-examination that someone else could have caused the distribution of child pornography from his IP address. Am. § 2255 Mtn. at 3. This ground consists of three sub-claims. First, he claims Bell should have called witnesses—namely, Bryan Hafertepe and Dana Hall (his ex-fiancée)—to testify that his Wi-Fi network was vulnerable to hacking because the password was visible to outsiders. Id. Second, he claims Bell should have called witnesses, namely Hafertepe and Hall, "that could refute the Government's theory that [Petitioner] must have used another computer to commit the offenses since no child pornography was found on his personal tablet." Id. Third,

---

[12]    For instance, through Richard Connor's testimony, Bell preempted the argument that evidence of child pornography had been wiped or deleted from Petitioner's tablet. Trial Tr. Vol. III at 109–20. Although the undersigned has conducted an independent review, it is worth noting that the judge who presided at trial remarked that he thought Petitioner was well-represented, that Bell was an "excellent lawyer," and that Bell "did as much as he could do with what he had to do with." Trial Tr. Vol. V at 21.

[13]    Worth noting, Petitioner said nothing about an alibi when he testified at trial, even when asked if he knew who was in his apartment during the timeframe in question. Trial Tr. Vol. III at 244, 245–46. Federal Rule of Criminal Procedure 12.1 (concerning notices of alibi defenses) would not have limited Petitioner's right to testify about an alibi. Fed. R. Crim. P. 12.1(e).

although not set forth in the Amended § 2255 Motion, Petitioner contends Bell should have investigated Hall as an alternate suspect. See Pet. Mem. at 5–6, 20–21.[14]

### 1. Failing to investigate Dana Hall as a witness or an alternate suspect

The undersigned first addresses the claim that Bell was ineffective for not calling or investigating Hall as a witness or suspect. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).[15]

Bell testified that Petitioner made it "pretty clear" he did not want counsel to contact Hall. Apr. 2022 Tr. Vol. I at 17. Bell explained that he deferred to Petitioner's judgment because he figured Petitioner was "the person that's in the best position to know" if she would be helpful. Id. at 69. Bell added: "If I felt strongly enough that there was exculpatory evidence, I would have [contacted Hall]. But there was nothing about my encounter with Mr. Neiheisel that suggested in any way that that was likely or possible." Id. at 72. Petitioner disputes none of this, but he argues Bell had to investigate Hall anyway. The Supreme Court has said otherwise, stating that when "a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful,

---

[14]    Petitioner failed to allege in the Amended § 2255 Motion that Bell should have investigated Hall as an alternate suspect. See generally Amended § 2255 Motion. A § 2255 movant must set forth all claims and supporting facts in the § 2255 motion. Rule 2(b), Rules Governing § 2255 Proceedings in the U.S. Dist. Courts. Because this allegation was not set forth in the Amended § 2255 Motion and Petitioner did not seek leave to amend under Fed. R. Civ. P. 15, it is not properly before the Court. But in the interest of completeness, the undersigned addresses it on the merits.

[15]    Decisions issued by the former Fifth Circuit Court of Appeals on or before September 30, 1981, are binding in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

counsel's failure to pursue those investigations may not later be challenged as unreasonable." Strickland, 466 U.S. at 691. And Petitioner identifies no "obvious red flags" that would have compelled all but the incompetent to investigate Hall as a witness or an alternate suspect. Scott v. United States, 890 F.3d 1239, 1259 (11th Cir. 2018) (holding that trial counsel was not ineffective for not investigating potential Brady and Giglio material where "no such red flags existed").

Petitioner also fails to show that Bell's failure to investigate Hall prejudiced him. He offers nothing, such as an affidavit from Hall, showing what testimony she would have offered. Bare, self-serving speculation that a missing witness would have given favorable testimony cannot carry the burden of a habeas petitioner. Johnson, 256 F.3d at 1186–87; United States v. Ashimi, 932 F.2d 643, 650 & nn.18–19 (7th Cir. 1991). Thus, Petitioner fails to show that Bell gave ineffective assistance by not investigating Dana Hall.

### 2. Whether someone else could have used Petitioner's Wi-Fi network

Turning to the argument that Bell failed to investigate or present the theory that someone hijacked his Wi-Fi network, that claim fails. Bell did present this theory at trial. He elicited testimony from Richard Connor that someone outside the apartment could have accessed Petitioner's Wi-Fi network had they known the password. Trial Tr. Vol. III at 124–25. While cross-examining Agent Privette, Bell elicited testimony that Petitioner's apartment was near a recreational area and implied that a registered sex offender had lived close by. Id. at 62–63, 66–67. Then, Petitioner testified about how his apartment was next to a busy walkway and a commons area. Id. at 191–96. He testified that the password to his Wi-Fi network was written on a 12" x 24" chalkboard in the guest bedroom near a large window. Id. at 195, 202–03. During closing arguments, Bell suggested that

someone could have seen the exposed password and used Petitioner's wireless network to share child pornography. Trial Tr. Vol. IV at 82–83. That tracks Bell's testimony at the evidentiary hearing that he sent an investigator to get a map of Petitioner's apartment complex and explore whether the Wi-Fi password could have been compromised. Apr. 2022 Tr. Vol. I at 46–47.

The theory ultimately failed, but not for lack of trying. Petitioner has not shown a reasonable probability that the outcome would have been different had Bell elicited cumulative testimony about the same theory from Hafertepe or Hall. See Rose v. McNeil, 634 F.3d 1224, 1243 (11th Cir. 2011) ("Obviously, a petitioner cannot satisfy the prejudice prong of the Strickland test with evidence that is merely cumulative of evidence already presented at trial."). Besides, Hafertepe acknowledged he never went outside the apartment to see if the password was visible through a window. Apr. 2022 Tr. Vol. I at 215. And Hafertepe's testimony appears to contradict Petitioner's. Whereas Petitioner testified that the Wi-Fi password was written on a chalkboard in the guest bedroom, Trial Tr. Vol. III at 202, Hafertepe testified that the password was written on a bulletin board in the kitchen, Apr. 2022 Tr. Vol. I at 215.

Petitioner argues that Bell negated the hijacked-network theory by saying in closing argument, "Im [sic] not suggesting somebody else did it." Pet. Mem. at 16. Petitioner misquotes the record and takes the statement out of context. What Bell really said is: "I'm not suggesting to you that we're proving that somebody else did it, but it might be a way, from the evidence itself and the lack of evidence in this case, for you to find a reasonable doubt." Trial Tr. Vol. IV at 86 (emphasis added); see also id. at 82–83. That jibes with the rest of the defense's argument, which emphasized that the government bore

34

the burden of proof, argued the existence of reasonable doubt, and attacked holes in the investigation. This is a common and reasonable defense strategy. Thus, Bell's closing argument did not negate the hijacked-network theory, and this claim should be rejected.

### 3.  Whether Petitioner owned any other devices

Petitioner claims Bell gave ineffective assistance by not calling witnesses—namely, Hafertepe and Hall—"that could refute the Government's theory that [Petitioner] must have used another computer to commit the offenses." See Am. § 2255 Mtn. at 3. He contends that Bell's failure to do so prejudiced him.

Hafertepe's testimony is uninformative. He said in his affidavit that, as a guest of Petitioner's, he "did not observe any other computer devices at his apartment" other than Petitioner's personal tablet. Affidavit of Bryan Hafertepe ¶ 4; accord Apr. 2022 Tr. Vol. I at 210. That Hafertepe saw only one device does not rule out the existence of others. He acknowledged he did not inquire or look through Petitioner's belongings in search of other computers. Apr. 2022 Tr. Vol. I at 214. Indeed, besides the tablet, Petitioner's GE work laptop and Hall's personal computer were also in the apartment at times. Trial Tr. Vol. III at 20–21. The trial record also reflects that Petitioner owned a cell phone, id. at 53, another potentially internet-capable device. Not that any of these devices were necessarily used to commit the offense, but it illustrates the limited nature of Hafertepe's testimony that he did not see any devices in the apartment besides Petitioner's personal tablet.

Petitioner essentially faults Bell for not proving a negative. But he does not show how Bell could have proved the non-existence of other devices. Hafertepe's testimony is unhelpful; Hall's testimony is anyone's guess; and law enforcement did not search

Petitioner's residence for other computers. That leaves Petitioner as the only other person with knowledge about whether there were other devices in the apartment. And Petitioner did touch on that subject during his trial testimony, when Bell asked him: "Did you use any other computer device, electronic device, by means of the Internet, whether it was this computer, your work computer, or any other computer, to make child pornography available to others on February 7th, 2017 [sic], sir?" Id. at 232. Petitioner answered, "Absolutely not." Id. The jury simply did not credit Petitioner's testimony, choosing instead to believe the FBI agents and the government's evidence.

Rather than try to prove a negative, it was reasonable for Bell to keep the jury focused on the premise that the government, not the defendant, bears the burden of proof, and that the government had introduced no forensic evidence of illicit images on any of Petitioner's devices. "[C]ounsel's reliance on particular lines of defense to the exclusion of others—whether or not he investigated those other defenses—is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." Chandler, 218 F.3d at 1318. That the strategy "ultimately proved to be unsuccessful [does not] demonstrate ineffectiveness." Id. at 1314.

For all these reasons, Petitioner's second ground should be rejected.

### C. Third Ground: Agent Privette's Grand Jury Testimony and Petitioner's Work Computer

Petitioner argues that Bell gave ineffective assistance by failing to cross-examine Agent Privette about allegedly misleading grand jury testimony, in which he seemed to say that a forensic examination confirmed the presence of child pornography on Petitioner's tablet. Because discrediting the FBI agents was central to Petitioner's

defense, Petitioner argues that Bell needed to impeach Privette's credibility by any means, including with Privette's prior grand jury testimony. Petitioner also alleges that Bell gave ineffective assistance by not cross-examining Privette or introducing other evidence that there was no child pornography on Petitioner's GE work laptop.

### 1. Agent Privette's Grand Jury Testimony

At trial, Bell cross-examined Agent Privette at length, impeaching him based on mistakes in the search warrant affidavit and suggesting that he was an inexperienced agent. See Trial Tr. Vol. III at 54–89; Trial Tr. Vol. IV at 21–26. But Bell did not cross-examine Privette about confusion in his grand jury testimony, apparently based on inexact questioning, in which Privette at one point agreed that a forensic examination of Petitioner's tablet confirmed that he had used BitTorrent, but arguably suggested that child pornography was found on the tablet as well. See Pet. Ex. 7 (Grand Jury Tr.) at 23–24. Bell testified that when he read the grand jury transcripts "in the run-up to trial," he did not interpret Privette's testimony to be false or misleading. Apr. 2022 Tr. Vol. I at 82–83; see generally id. at 81–89. Bell explained that he found Privette's grand jury testimony to be so "easily and readily explainable" that it was of no evidentiary value, and therefore he did not use it to impeach him. Id. at 85, 89. The undersigned recommends that this was a reasonable choice.

Petitioner argues that Bell's explanation is not credible because Bell did not seem to understand the issue when it came up during a post-conviction interview with the government. Pet. Mem. at 14. Bell explained that at the time, he had not read the grand jury transcripts in years. Apr. 2022 Tr. Vol. I at 82. Plus, Bell's rationale for not impeaching Privette with his grand jury testimony is supported by the grand jury transcript itself. Below

are the relevant portions of Privette's grand jury testimony, with the allegedly misleading

part emphasized:

> Q:      And then did the forensic examination and your review of the content
> show that [the Microsoft tablet] actually did contain BitTorrent, which was
> consistent with Jimmy Watson's investigation?
>
> A:      Yes, that's correct.
>
> ***
>
> Q:      And did that – was that consistent with what Mr. Neiheisel had told
> you?
>
> A:      That did corroborate with his statements on April 11th.
>
> Q:      And did you find that there was no child pornography videos or
> images that were able to be retrieved or discovered from the tablet?
>
> A:      That's correct. Based on my review and the review of the forensic
> examiner, there did not appear to be any child pornography currently on
> that tablet, which also corroborated with his statements.
>
> Q:      And corroborated with his statements that he had deleted – that he
> deleted content periodically?
>
> A:      That's correct, yes.
>
> Q:      All right. At some point, I believe, on April 25th, did you arrange to
> meet with Mr. Neiheisel at the Town Center here in Jacksonville?
>
> A:      Yes, that's correct.
>
> ***
>
> Q:      And what additional information did Mr. Neiheisel provide you with?
>
> A:      Mr. Neiheisel upon meeting us at Panera Bread, he advised that he
> had been thinking about our last conversation and said that he didn't think
> – or his exact quote was that he never used BitTorrent. Then once we
> discussed in a little bit further detail the nature of our conversation
> previously, he did affirm that he had used BitTorrent to download images of
> child pornography.
>
> Q:      And that was confirmed by the forensic exam; correct?

A:    <u>Yes, that's correct.</u>

Q:    And it was also confirmed by what he told you on the 11th; correct?

A:    Yes.

Pet. Ex. 7 (Grand Jury Tr.) at 22–24 (emphasis added).

This is a molehill that Petitioner tries to turn into a mountain. It is obvious Privette meant to agree only that a forensic exam had confirmed the installation of a BitTorrent program on Petitioner's tablet, not that an exam confirmed the presence of child pornography. Just a few questions earlier, Privette plainly told the grand jury that a forensic exam revealed no child pornography on the device. The mistake arose because Privette's statement preceding the prosecutor's question contained two parts: (1) that Petitioner had affirmed using BitTorrent (2) to download child pornography. The follow-up question—whether "that was confirmed by the forensic exam"—was unclear and leading. Although Privette arguably should have corrected the attorney's imprecise question, it is apparent that Privette did not intend to mislead the grand jury, and the petit jury likely would have recognized this had Bell tried to impeach him. Thus, Bell had a reasonable basis not to impeach Privette based on his readily-explainable grand jury testimony, nor was Petitioner prejudiced under <u>Strickland</u>.[16]

### 2. The GE work laptop

Petitioner asserts that Bell gave ineffective assistance by failing to cross-examine Privette about the fact that, according to a GE representative, there was no evidence of child pornography on Petitioner's work laptop. Petitioner also asserts that Bell

---

[16]    Further, impeaching Privette with his grand jury testimony would not have impeached the testimony of Agent MacDonald, who also testified in detail about Petitioner's confessions.

unreasonably failed to investigate or present other evidence that the GE laptop was free of contraband. Doing so was important, Petitioner argues, to rebut the theory that Petitioner used a device other than his personal tablet to commit the offense.

Bell testified he did not plan to collect Petitioner's work laptop for inspection because GE represented to the FBI that the device was clean, and he was confident he could get that fact in while cross-examining Privette. See Apr. 2022 Tr. Vol. I at 48–49. Bell admitted he forgot to do so because he got sidetracked. Id. at 47–48.

While the trial record is consistent with Bell's testimony, the trial record is not altogether silent about the work laptop. On cross-examination of Agents MacDonald and Privette, Bell elicited testimony that the FBI had been in contact with a GE representative about the work laptop, that GE planned to examine the laptop, and yet the FBI never sought a search warrant or a subpoena for the device. Trial Tr. Vol. II at 175–76; Trial Tr. Vol. III at 81–83. In his closing remarks, Bell responded to the government's "other device" theory by pointing out that even though the FBI had been in touch with GE representatives about the work laptop, the government introduced no evidence that it contained any contraband. Trial Tr. Vol. IV at 80.

The undersigned assumes that Bell could have introduced evidence (such as a GE or FBI report, or testimony from Privette) affirmatively showing that the GE work laptop was clean, and that it may have been deficient for Bell not to do so.[17] However, there is not a reasonable probability that, had Bell introduced such evidence, the jury would have acquitted Petitioner. The jury knew (1) the FBI had been in touch with GE representatives

---

[17]     Even this assumption is questionable though. Given the government's burden of proof at trial and the lack of any evidence presented by the government about the work computer, a reasonable defense attorney could have likely relied on those circumstances alone.

about the work computer, yet (2) the government neither tried to collect nor presented any evidence of contraband on that computer. Given that, the jury very likely did not suspect Petitioner had used his work laptop to commit the offense anyway. And while not impossible, the jury would likely have considered the general improbability that a person of reasonable intelligence (as Petitioner appeared to be) would use a work computer instead of a personal device to engage in this type of activity. Thus, Bell's failure to affirmatively prove that the work laptop was clean did not "alter[ ] the entire evidentiary picture." Strickland, 466 U.S. at 696.

Plus, even if Bell had proved that the work laptop was clean, it would not have foreclosed the government's argument that Petitioner used some other unknown device to commit the offense (which applies equally to Petitioner's claim that Bell should have called additional witnesses to testify that they were unaware of any other devices). Juries understand that offenders sometimes conceal the instruments of their crimes. As the government asserted in closing argument and the Eleventh Circuit reiterated on appeal, the government did not have to prove that Petitioner used a specific device, only that he distributed child pornography. Neiheisel, 771 F. App'x at 939–40. And there was sufficient evidence to convict Petitioner even if, after ruling out the work laptop, the jury did not know which device he used. Two FBI agents testified consistently and in detail about how Petitioner confessed to saving videos of child pornography in a shared downloads folder connected to BitTorrent; it was (and is) unrefuted that child pornography was shared from Petitioner's password-protected internet network; and the Vuze BitTorrent program that was installed on Petitioner's tablet matched the Vuze program used to share child

pornography. Further, the jury was free to "disbelieve Neiheisel's testimony ... and use it as substantive evidence of his guilt." Id. at 939 (citation omitted).

"Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." Strickland, 466 U.S. at 696. Petitioner has not met that burden. Although the trial evidence was not overwhelming, it was not weak either. Given the evidence and arguments raised at trial, as recounted above, and the unlikelihood that the jury thought Petitioner committed the crime with the work laptop, there is no reasonable probability the jury would have acquitted Petitioner had Bell introduced evidence proving that the work laptop was clean. Bell's omission about the work laptop does not undermine confidence in the verdict. Id. at 694. Thus, the undersigned recommends denying this claim.[18]

### D. Fourth Ground: Torrential Downpour and GUID Evidence

Next, Petitioner contends that Bell gave ineffective assistance by not seeking to compel production of Torrential Downpour's internal programming information, failing to investigate or present evidence about Torrential Downpour, and failing to investigate so-called GUID evidence. Am. § 2255 Mtn. at 4, 13–14, 21–23.

---

[18]     The undersigned recognizes that the jury deliberated for over a day and twice said it had not reached a verdict. See Trial Tr. Vol. V at 3–17; (Crim. Doc. 68-2 (jury note indicating the vote was 10-2)). Previously, the jury had asked: (1) whether any adult pornography was found on Petitioner's computer (since Petitioner had stipulated to viewing adult pornography on his tablet), (2) whether the jury could see the FBI 302 reports of the two interviews with Petitioner, and (3) for a definition of "producing." (Crim. Doc. 66-1; Crim. Doc. 66-2.) None of these questions suggests that the jury was concerned about the contents of Petitioner's work computer.

Bell testified that during his conversations with Connor, Connor did not raise any flaws with the Torrential Downpour program, recommend that he needed to inspect Torrential Downpour's software operating information, or discuss GUID evidence. See Apr. 2022 Tr. Vol. I at 50–52, 133–34. Connor does not deny this. Petitioner also identifies no "obvious red flags" that would have compelled all but the incompetent to investigate Torrential Downpour or GUID evidence in this case. See Scott, 890 F.3d at 1259. Thus, Bell reasonably relied on his computer expert in deciding not to move to compel access to Torrential Downpour's operating information or to investigate GUID evidence. See Harvey, 629 F.3d at 1262–63 (holding that an attorney was not ineffective for not investigating whether client had brain damage where counsel "chose to rely on his expert, who gave him no reason to doubt that [defendant] was competent").

Petitioner fails to show prejudice as well. Even if Bell had moved to compel access to Torrential Downpour's internal programming information, it is only speculative whether that motion would have been granted. Similar motions have been denied in other cases, owing in part to the sensitive nature of the software. See, e.g., United States v. Jean, 891 F.3d 712, 715 (8th Cir. 2018); United States v. Pirosko, 787 F.3d 358, 365–67 (6th Cir. 2015). Petitioner also fails to prove what, if any, helpful evidence would have come from an investigation of Torrential Downpour or GUID evidence. His computer expert did not identify anything beneficial that would have come from investigating Torrential Downpour or GUID data. Petitioner speculates that Torrential Downpour malfunctioned during the investigation and that the GUID evidence would have contained exculpatory information, but he produces no evidence that either was actually the case. "Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been

revealed by further investigation." <u>Aldrich v. Wainwright</u>, 777 F.2d 630, 636 (11th Cir. 1985). Indeed, one district court observed that it had identified <u>no</u> case where Torrential Downpour was found to be unreliable. <u>United States v. Schwier</u>, No. 3:17-cr-95-SLG, 2020 WL 1258027, at *4 n.42 (D. Alaska Mar. 16, 2020). Thus, the undersigned recommends that this claim be rejected.

### E.  Fifth Ground: Ineffective use of Computer Expert

Finally, Petitioner alleges that Bell was ineffective because he failed to notify Connor about the alibi (or elicit testimony that could have supported the alibi), provide him discovery about Torrential Downpour and GUID evidence, give him access to Petitioner's "exculpatory router," request that he investigate the work computer, or elicit testimony that would have helped Petitioner establish the theory that someone else shared child pornography from his IP address. Am. § 2255 Mtn. at 4, 12–16, 27.

About the alibi, there was conflicting testimony whether Bell informed Connor that Petitioner had traveled to Cincinnati on the evening of February 7, 2016. Bell testified that he did, that he asked Connor to see if Petitioner's tablet had connected to IP addresses outside of Jacksonville (which Connor confirmed), and that if Connor recalled differently, then Connor was mistaken. Apr. 2022 Tr. Vol. I at 42–43, 96–98, 132. Connor did not recall discussing the alibi with Bell, <u>id.</u> at 223–24, but he "believe[d he] had information from [his] forensic exam," which he conducted before the trial, "that showed the computer connecting to … a hotel wifi or something in Cincinnati the night of the 7th or the 8th," <u>id.</u> at 225. While Bell and Connor impressed the undersigned as honest witnesses, the undersigned credits Bell's recollection. As the trial attorney, Bell had more prolonged and intensive involvement in the case than Connor. Plus, it appears inconsistent for Connor

to say that he did not know Petitioner was out of town on February 7 and 8, 2016, id. at 224, yet he had information from his forensic exam that Petitioner's tablet had connected to a hotel Wi-Fi in Cincinnati on those same dates, id. at 225. Thus, the undersigned credits Bell's testimony and finds that he did discuss the alibi with Connor. And for the reasons discussed in Section V.A., Bell did not give ineffective assistance by not pursuing the faulty alibi.

About the claim that Bell failed to provide Connor discovery related to Torrential Downpour and GUID evidence, Bell testified that he "tried to get [Connor] all the discovery that [he thought was] relevant" and is "virtually certain" he gave Connor copies of the Torrential Downpour logs. Apr. 2022 Tr. Vol. I at 132. Likewise, Connor testified that he reviewed the government's discovery and that Bell gave him copies of the Torrential Downpour and ICACCOPS logs. Apr. 2022 Tr. Vol. I at 222, 224, 227; accord Trial Tr. Vol. III at 114-15. Thus, Petitioner fails to prove that Bell did not provide Connor appropriate discovery. And for the reasons in Section V.D., Petitioner has not shown that Bell was ineffective in regard to investigating Torrential Downpour or GUID evidence.

As for the "exculpatory router," Petitioner speculates that if Bell had asked Connor to examine the wireless router, Connor would have discovered that someone else had used Petitioner's Wi-Fi network to share child pornography. See Am. § 2255 Mtn. at 4, 11, 14, 23–24. Bell explained that he did not examine the router because (1) Connor did not recommend it and (2) Bell did not want to search for potentially incriminating evidence, a concern he had after Petitioner failed the polygraph. Apr. 2022 Tr. Vol. I at 49–51, 98–100. Connor testified that a wireless router could "[p]ossibly" identify the source of child pornography. Id. at 234. But, Connor also said, a router's memory can be wiped out by a

power outage or a reset, and he could not say whether, by the time Petitioner was being investigated, the router had retained any memory from 14 months earlier. Id. at 244–46. In the end, Petitioner introduced no evidence of what his router would have shown. Speculation that it would have revealed something exculpatory cannot support habeas relief. Aldrich, 777 F.2d at 636. Thus, Petitioner fails to show that Bell's decision not to investigate the router was deficient or prejudicial under Strickland.

Relatedly, Petitioner claims Bell failed to elicit testimony from Connor about the theory that another person could have distributed child pornography from his Wi-Fi network. That is incorrect and meritless for the reasons stated in Section V.B.2.

Lastly, Petitioner claims Bell should have had Connor examine the GE work laptop. Bell testified that he did not plan to independently investigate the laptop because he was content with eliciting testimony from Agent Privette that, according to his source at GE, the laptop was clean. See Apr. 2022 Tr. Vol. I at 48–49. That was a reasonable choice. See Williams, 185 F.3d at 1237. If Bell performed deficiently at all, it was in forgetting to follow through with eliciting testimony or evidence affirmatively showing that the work laptop was clean. Even so, this omission did not prejudice Petitioner for the reasons in Section V.C.2. Thus, relief on this ground should be denied.

## VI.    Conclusion

For all the above reasons, it is respectfully **RECOMMENDED** that Petitioner Jason Neiheisel's Amended § 2255 Motion (Civ. Doc. 14) be **DENIED**.

**Notice to Parties**

"Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); see also Rules 8(b), 12, Rules Governing § 2255 Proceedings in the U.S. Dist. Courts. "A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the Eleventh Circuit Court of Appeals, including waiver of the right to challenge anything to which no specific objection was made. See Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

**DONE AND ENTERED** at Jacksonville, Florida this 27th day of September, 2022.

JOEL B. TOOMEY
United States Magistrate Judge

lc 19
Copies to:
Hon. Brian J. Davis, United States District Judge
Counsel of Record
Petitioner Jason James Neiheisel